2020R00248/BC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Crim. No. 23- |
| | : | |
| MITCHELL E. GREEN | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 2 |
| | : | (Wire Fraud) |

### I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

### INTRODUCTION

1. From in or around June 2017 through in or around February 2020, the defendant, MITCHELL E. GREEN ("GREEN") defrauded the international liquor company for which he worked and its owner ("Victim Company," "Victim 1," and together the "Victims"), by, among other things: (a) fraudulently causing the Victims to pay inflated prices for champagne and cognac from French distributors so that the distributors would pay GREEN kickbacks for those sales; and (b) concealing from the Victims over $2 million in kickbacks that GREEN received for himself and others based on those inflated sales.

## Background

2.    At all times relevant to this Information:

*Individuals and Entities*

a.    GREEN resided in Connecticut and worked fulltime from Victim Company's offices in Hoboken, New Jersey.  GREEN first worked as a consultant for Victim Company from in or around June 2017 to in or around June 2018, and then as a fulltime salaried employee from in or around June 2018 to in or around February 2020.  GREEN signed employment agreements in or around June 2018 and June 2019 that expressly prohibited him from receiving compensation from any third-party company that was negotiating or had entered into an agreement with Victim Company for an economic benefit.

b.    Victim Company was a limited liability company formed in Delaware and located in Hoboken, New Jersey. Among other business activities, Victim Company, operating through subsidiaries that it owned and controlled, bought and distributed French champagne and cognac throughout the United States.

c.    Victim 1 owned and controlled Victim Company and was also an internationally recognized music artist, producer, and entrepreneur.

d.    Q Branch Consulting LLC ("Q Branch") was a company that GREEN owned, controlled, and used in furtherance of the schemes discussed below.

e.    Champagne Company and Cognac Company were both headquartered in France and respectively sold champagne and cognac to Victim Company.

f.      Individual 1 was a French national who worked for Champagne Company and served as an intermediary for GREEN with both Champagne Company and Cognac Company.

***Champagne and Cognac Purchases***

g.      Victim Company authorized GREEN to negotiate and enter into a supply agreement on Victim Company's behalf with Champagne Company, which was executed in or around October 2017 (the "Champagne Supply Agreement"). That agreement required, among other things, that: (i) Champagne Company provide Victim Company periodic price lists containing the total price per bottle for various types of champagne; (ii) after Victim Company bought champagne based on the price lists, Champagne Company would invoice Victim Company reflecting the listed prices; and (iii) based on those invoices, Victim 1 would authorize payment to Champagne Company.

h.      GREEN directly facilitated sales under the Champagne Supply Agreement by, among other things, determining the price per bottle with Individual 1, transmitting the price lists to Victim Company, and placing champagne purchase orders with Champagne Company on behalf of Victim Company. GREEN also facilitated the payment of invoices to Champagne Company by transmitting the invoices to representatives of Victim Company and expediting the review, processing, and payment of those invoices.

i.      Similarly, in or around July 2018, Victim Company and Cognac Company—through GREEN—signed an interim agreement for Cognac Company to

3

supply cognac to Victim Company. That agreement was finalized in or around April 2019 (the "Cognac Supply Agreement").

j.     The Cognac Supply Agreement was similar to the Champagne Supply Agreement, including the provision requiring Cognac Company to provide periodic per-bottle price lists to Victim Company. GREEN's responsibilities regarding the Cognac Supply Agreement were also similar, and included creating and providing the per-bottle price lists for the cognac, placing orders on behalf of Victim Company based on those lists, and actively expediting the processing and payment of invoices for those purchases.

## The Scheme to Defraud

3.     From in or around June 2017 through in or around February 2020, in the District of New Jersey and elsewhere, defendant

## MITCHELL E. GREEN

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and to deprive the Victims of money by means of materially false and fraudulent pretenses, representations, and promises, as set forth below.

## Goal of the Scheme to Defraud

4.     The goal of the scheme was for GREEN, through concealment and deception, to enrich himself and others by fraudulently causing the Victims to pay inflated prices for champagne and cognac so that GREEN would receive kickbacks, which he called "agency fees," from the sellers of those products.

## Manner and Means of the Scheme to Defraud

5.     It was part of the scheme to defraud that:

4

a.    Unknown to the Victims, on or about July 1, 2017, while negotiating the pricing and initial purchase of champagne from Champagne Company, GREEN negotiated and signed a confidential Agency Agreement with Champagne Company (the "Champagne Company Agency Agreement").

b.    Among other things, the Champagne Company Agency Agreement: (i) entitled GREEN, through his company Q Branch, to kickbacks—which were called "agency fee" payments—for each bottle of champagne that Victim Company purchased from Champagne Company; and (ii) required GREEN to provide champagne to Victim Company, to the exclusion of champagne from any competitor.

c.    Unknown to the Victims, on or about December 21, 2018, while negotiating the pricing and initial purchase of cognac from Cognac Company, GREEN also negotiated and signed a confidential Agency Agreement with Cognac Company (the "Cognac Company Agency Agreement"). The terms of the agreement were similar to the terms of the Champagne Company Agency Agreement and entitled GREEN, through Q Branch, to agency-fee kickback payments for each bottle of cognac that Victim Company purchased from Cognac Company.

d.    Throughout his tenure as a consultant and employee for Victim Company, GREEN failed to disclose to the Victims the existence or terms of the Champagne Company Agency Agreement or the Cognac Company Agency Agreement—including the kickback payments.

e.    GREEN also knowingly and intentionally caused the Victims to pay the entire cost of GREEN's agency-fee kickbacks, without disclosing to the

5

Victims that they were paying those fees. Aided by Individual 1, GREEN routinely hid his agency-fee kickbacks (the "Hidden Fees") within the per-bottle cost of the champagne and cognac that Victim Company purchased. The Victims paid those costs, believing they reflected the wholesale price of the champagne and cognac and without knowing that they also contained the Hidden Fees.

f.     The Victims paid Champagne Company and Cognac Company for their respective products, and GREEN, operating through Q Branch, collected the Hidden Fees from Champagne Company and Cognac Company, which GREEN concealed from the Victims.

g.     GREEN's efforts to conceal the Hidden Fees from the Victims began as early as in or around June 2017, when GREEN, referring to the Hidden Fees, instructed Individual 1 by email, "[P]lease do not mention anything on the Agent Fee per bottle that we discussed." GREEN sent this email when he and Individual 1 were preparing to send Victim Company the price list for its first champagne purchase from Champagne Company.

h.     Subsequently, from in or around July 2017 to in or around February 2020, GREEN submitted approximately 16 Champagne Company invoices to Victim Company for approximately $4.8 million in champagne purchases. The invoices showed only the total per-bottle price, without identifying GREEN's Hidden Fees.

i.     From in or around July 2018 to in or around January 2020, GREEN submitted approximately four Cognac Company invoices to Victim Company

6

totaling approximately $10 million in cognac purchases. Those invoices also showed only the total per-bottle price, without identifying GREEN's Hidden Fees.

j.    From in or around August 2017 to in or around July 2019, GREEN submitted, and received payment on, approximately three invoices from Q Branch to Champagne Company, reflecting approximately $605,000 in Hidden Fees that GREEN concealed from the Victims. GREEN collected over $538,000 of those fees while he was an employee of Victim Company.

k.    From in or around September 2018 to in or around February 2020, GREEN submitted, and received payment on, approximately nine invoices from Q Branch to Cognac Company, reflecting approximately $1.58 million in Hidden Fees that GREEN concealed from the Victims. GREEN collected all of those fees after he had already become a fulltime employee of Victim Company.

l.    In total, from in or around October 2017 to in or around August 2019, GREEN received Hidden Fees through Q Branch via wire payments of approximately $2.185 million from Champagne Company and Cognac Company. GREEN caused the Victims to unknowingly pay for all of those fees through the inflated prices, discussed above.

m.    The total loss to the Victims was over $2.185 million.

## Execution of the Scheme to Defraud

6.     On or about October 24, 2018, for the purpose of executing the scheme and artifice to defraud, in the District of New Jersey and elsewhere, defendant

**MITCHELL E. GREEN**

did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, including wire transmissions, specifically, an international wire transfer of approximately $414,298.60 from Cognac Company's bank account in France to the Q Branch bank account, which wire transfer passed through New Jersey.

In violation of Title 18, United States Code, Section 1343 and Section 2.

## FORFEITURE ALLEGATION

1.      Upon conviction of the wire fraud offense charged in this Information, defendant, **MITCHELL E. GREEN**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION

3.      If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendant up to the value of the forfeitable property described above.

_____
PHILIP R. SELLINGER
United States Attorney

9